Nancy Ribaudo
Texas Bar I.D. 24026066
nancy.ribaudo@kellyhart.com
Katherine T. Hopkins
Texas Bar I.D. 24070737
katherine.hopkins@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: 817/332-2500
Telecopy: 817/878-9774

*Proposed Counsel for Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | |
| WOODBRIDGE PARTNERS, L.P., | § | CASE NO. 24-41520-11 |
| BRENTWOOD NURSERY, INC., | § | CASE NO. 24-41523-11 |
| SEVILLE FARMS, INC., | § | CASE NO. 24-41526-11 |
| INTEGRATED BOTANICS, LP, | § | CASE NO. 24-41527-11 |
| GB2 HOLDINGS, LLC, | § | CASE NO. 24-41529-11 |
| HILLISTER FARMS, L.L.C.[1], | § § | CASE NO. 24-41530-11 |
| Debtors. | § § | **(Joint Administration Requested)** |
| | § | **Expedited Hearing Requested** |

**DECLARATION OF WILLIAM A. BRENTLINGER
IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, William A. Brentlinger, hereby submits this declaration (the "Declaration") pursuant to 28 U.S.C. § 1746, and declare under penalty of perjury that:

1. My name is William A. Brentlinger. I am over the age of twenty-one and am competent to make this Declaration. I am the President of Seville Farms, Inc. and Brentwood

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Woodbridge Partners, L.P. (6716); Brentwood Nursery, Inc. (3393); Seville Farms, Inc. (6380); Integrated Botanics, LP (7617); GB2 Holdings, LLC (0872); and Hillister Farms, L.L.C. (5295).

Document    Page 2 of 17

Nursery, Inc., manager of Hillister Farms, L.L.C., and managing member of GB2 Holdings, LLC. Seville Farms, Inc. serves as the General Partner of Woodbridge Partners, L.P. and Integrated Botanics LP (the above-referenced debtors are collectively referred to herein as "Debtors"). In such capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and employees.

2. On May 1, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

3. I submit this Declaration in support of each Debtor's voluntary petition and the relief requested in the following expedited motions filed by the Debtors in connection with their bankruptcy petitions (collectively, the "First Day Motions"):

   i. Joint Expedited Motion for Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion");

   ii. Notice of Designation as Complex Chapter 11 Bankruptcy Cases ("Notice of Complex Case Designation";

   iii. Joint Expedited Motion to Limit Notice ("Motion to Limit Notice");

   iv. Joint Expedited Motion for the Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion");

   v. Joint Expedited Motion to Extend Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion"); and

   vi. Joint Request for Expedited Consideration of "First Day" Motions.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interactions, my review of relevant documents, business records, and my experience and knowledge of the Debtors' operations and financial conditions. I

IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS                    PAGE 2 OF 17
3933610

am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I. BACKGROUND

5. Debtors commenced the chapter 11 cases to facilitate an orderly process to sell assets and pay creditors. The Debtors and their advisors expect the Chapter 11 process will best preserve and protect the Debtors' assets, as well as allow for the sale of substantially all of the assets of the Debtors to maximize value for the benefit of creditors.

### A. The Debtors' Business and Operations

6. The Debtors are a family owned wholesale greenhouse business. I, along with my brother, Robert Brentlinger, were the primary founders of Seville Farms, Inc. ("Seville Farms") in 1994. We started in a small shop near Mansfield, Texas. Over the next 20 years, we expanded our business to five owned facilities and numerous leased locations across Texas. Our mission was to provide high quality annuals, perennials and ground covers to garden centers across Texas. We achieved that goal for more than 25 years.

7. Seville Farms operated the facilities across Texas with production space in the millions of square feet. The facilities were located in Mansfield, Waxahachie, Schulenburg, Los Fresnos, Tyler and New Summerfield, among other places, and were used to grow products and plants appropriate for the regional climate and temperature zones.

8. Integrated Botanics, LP ("IBOT") conducted growing operations out of the Mansfield location and focused on the production of starter plants used by all sites to grow finished goods for our customers.

9. Woodbridge Partners, L.P. ("Woodbridge") owns the real property and five facilities located in Mansfield, Waxahachie, Schulenburg, Los Fresnos and Tyler, Texas.

10. Brentwood Nursery, Inc. ("Brentwood") owns a portion of the real property (twenty (20) acres) located in Mansfield, Texas.

11. Hillister Farms, LLC ("Hillister") operated a leased facility and had similar operations as Seville.

12. GB2 Holdings, LLC ("GB2") serves as the general partner of a related entity, Quick Turn Merchandising, LP[2], and does not have any operations.

B. **Debtors' Organizational Structure**

13. Each Debtor is a part of the Seville Farms organization, which is now headquartered in Mansfield, Texas. The Debtors are all related entities. Seville Farms and Brentwood are each a Texas corporation. Woodbridge and IBOT are each a Texas limited partnership. Hillister and GB2 are each a Texas limited liability company.

14. The majority of ownership of each Debtor entity is held by myself and my brother, Robert.

C. **Prepetition Capital Structure**

15. Prior to the Petition Date, the Debtors entered into two loan agreements with Greater Nevada Credit Union ("GNCU") and the following documents in connection therewith (collectively "GNCU Loan Documents"):

- That certain Loan Agreement, as subsequently amended, dated August 16, 2018, and Promissory Note, in the principal amount of $15,000,000, by and between GNCU, as lender, and Seville, Woodbridge, Hillister, Brentwood, IBOT, GB2, Quick Turn, Robert Brentlinger and myself, as borrowers ("GNCU/USDA Loan");

  o That certain Security Agreement, dated as of August 16, 2018, by and between GNCU and Seville, Woodbridge, Hillister, Brentwood, IBOT, GB2, Quick Turn, Robert Brentlinger and myself, as borrowers, related to certain personal property;

---

[2] Quick Turn Merchandising, LP ("Quick Turn") is a related non-debtor entity that provided other support services to the Debtors. Specifically, Quick Turn's employees visited customer locations at various stores and assisted with merchandising of the products.

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Tarrant County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Hillister, as borrower, related to certain real property located in Tyler County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated August 16, 2018, by and between GNCU and Seville, as borrower, related to certain real property located in Cherokee County;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Seville, as borrower, related to certain real property located in Cherokee County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Cameron County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Fayette County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Johnson County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, granting a lien on certain real property located in Smith County, Texas; and

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Ellis County, Texas.

- That certain Business Loan Agreement and Note, dated August 16, 2018, in the original amount of $2,200,000 by and between GNCU, as lender, and Seville, Hillister, Woodbridge, IBOT, and Quick Turn as borrowers, and guaranteed by Brentwood, Robert Brentlinger and myself ("GNCU/SBA Loan");

  - o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Tarrant County, Texas;

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge, as borrower, related to certain real property located in Ellis County, Texas; and

- o That certain Deed of Trust and Assignment of Rents, dated as of August 16, 2018, by and between GNCU and Woodbridge and Brentwood, as borrowers, related to certain real property located in Johnson County, Texas.

16. In addition, certain of the Debtors also entered into loan agreements and security agreements with the U.S. Small Business Administration ("SBA") and Iron Horse Credit, LLC "Iron Horse"). Specifically, Debtors entered into the following:

- That certain Loan Authorization and Agreement, dated May 17, 2020, and promissory note in the amount of $150,000, by and between the SBA as lender and Seville as borrower ("SBA Disaster Loan");

  - o That certain Security Agreement dated May 17, 2020, by and between the SBA and Seville with respect to all tangible and intangible personal property of Seville including equipment, inventory, and accounts;

- That certain Credit and Security Agreement, dated January 1 2020, as subsequently amended on August 3, 2020, in the maximum amount of $12,000,000, by and between Iron Horse as lender and Seville, Woodbridge, Hillister, Brentwood, IBOT, GB2 and Quick Turn, as borrowers, guaranteed by Robert Brentlinger and myself ("Iron Horse Loan").

17. Seville also has significant unsecured debt obligations in the approximate amount of $16,000,000 (non-affiliate unsecured debt) comprised primarily of trade debt, and unpaid obligations under various agreements. Unsecured trade debt owed to each of the other Debtors is significantly less.

D. **Prepetition Marketing and Sale Process**

18. In the summer of 2022, the Debtors faced a number of financial stressors due to increases in distribution costs resulting from general inflation and Covid-19, and the loss of a significant and primary customer. Significantly, the customer, a big box retailer, represented approximately 75% of total revenue and Debtors' customer base. The loss of that customer, mid growing season, caused immediate and irreparable liquidity and cash flow issues.

19. At that time, given the nature of the garden growing business and lead times required for inventory, the Debtors were left with few options to restore their customer base and sell inventory. After long, thoughtful and deliberate consideration, I, together with the management team, came to the difficult realization that continued business operations were not sustainable.

20. At that time, I, together with the management team, notified and collaborated with the Debtors' primary secured lenders at the time, GNCU and Iron Horse (the "Lenders"), to begin to formulate a plan for winding down and selling Debtors' business and assets. Although bankruptcy relief was considered in 2022, we instead pursued a marketing and sale process outside of bankruptcy in keeping with the Lenders' preferences at the time. Thereafter and beginning the summer of 2022, the Debtors, in collaborative efforts with the Lenders, began extensive marketing efforts to sell the businesses as a going concern. I set up and participated in weekly calls with the Lenders to provide updates and strategize marketing and sale efforts with the goal of reducing outstanding secured debt.

21. We employed Ferguson Alliance, LLC ("Ferguson") to serve as marketing agent. Rob Ferguson, has extensive experience and familiarity with the greenhouse industry, having served as chief executive officer for a publicly traded nursery. Ferguson previously provided strategic planning and consulting services to the Debtors beginning in 2015.

22. Ferguson's role was expanded in 2022 to assist with marketing the business assets to large entities in the growing industry nationwide. At the time, the Debtors' primary assets consisted of the facilities, real property, inventory, equipment, accounts receivables, trade names and business goodwill. Ferguson developed a target list, which included twenty potential purchasers, including national producers, regional producers, local (Texas) producers, vegetable

producers, investor groups, and real estate developers. As a result of those marketing efforts, the Debtors received numerous offers, including both verbal offers and letters of intent.

### a. Sale as a Going Concern

23. Ferguson and the Debtors worked with several interested parties to sell the entire operations as a going concern. Extensive negotiations regarding a proposed sale to one interested party continued for numerous months. Unfortunately, the parties could not reach agreeable terms for a sale and the proposed sale was terminated on or around October 2022.

### b. Sale of Real Property

24. At the same time, Ferguson and the Debtors explored options to sell the real property assets separately. Ferguson identified potential purchasers for Tyler, Schulenburg, and Los Fresnos (the "Grower Properties"), which had particular appeal to purchasers in the grower industry. Recognizing that the Mansfield and Waxahachie properties may have particular value in the commercial development space, the Debtors retained a commercial property broker, Texas Land Advisors, LLC d/b/a Land Advisors Organization ("Land Advisors"), to market the properties in Mansfield and Waxahachie (collectively, the "Commercial Properties").

25. For the Grower Properties, Ferguson received many offers, negotiated potential sale terms, and the Debtors entered into purchase agreements from August 2022 through December 2023. For various reasons, including buyer financing issues, none of the prospective sale transactions closed. Upon information and belief, a number of these potential buyers are still interested in the properties and the Debtors intend to explore these possibilities further post-petition.

26. With regard to the Commercial Properties, Land Advisors extensively marketed the Commercial Properties and secured several offers in line with valuations that both the Debtors and

the Lenders were willing to accept. The sales, however, were proposed to take place in stages to allow for necessary permitting and other approvals before final closing. It is my understanding that due to the buyers' concerns related to a potential bankruptcy prior to a final closing, the proposed purchasers were not willing to proceed outside bankruptcy unless there was a significant reduction in price. As a result, those negotiations ended last summer.

27. I believe that at least some of these parties remain interested in the properties and expressed a preference to conduct a purchase within bankruptcy.

  *c.*  ***Sales of Personal Property***

28. Debtors and Ferguson, working alongside the Lenders, also engaged in efforts to separately sell personal property, which primarily consisted of inventory (live plants and raw materials) and equipment. Due to lengthy grow times associated with plant production, Debtors were required to continue operations through the end of 2022, and thereafter on a reduced basis, in order to maintain production assets for sale.

29. As explained, and due to lengthy grow times, in order to sell perishable, "live" inventory already in production, Debtors continued to operate through the end of 2022. By the fall of 2022, the Debtors and Ferguson had sold the majority of the "booked" finished goods inventory. From August 1, 2022 to December 31, 2022, the finished goods sales to customers resulted in gross sale proceeds of approximately $6,000,000. Such proceeds were used to cover shipping, processing, and other expenses in the ordinary course of business, as well as payment on Iron Horse's secured debt on inventory. The remainder of the live goods inventory, which was mostly work in process ("WIP") young plants and various speculative inventory, was either liquidated based on the best offer or disposed of, as the nature of live goods provides only a limited timeline for selling.

30. The Debtors and Ferguson continued to market and sell remaining raw material inventory. The sales of inventory resulted in approximately $2,000,000 in sale proceeds. Such sale proceeds were used to significantly reduce Iron Horse's secured debt as well as used to pay operational costs in the ordinary course of business.

31. As the process of selling inventory was winding down, the Debtors and Ferguson began selling equipment. At the time, Debtors continued operations on a reduced basis to maintain property for sale. The initial focus therefore was on selling equipment that was not needed in ongoing operations. This process continued throughout 2023, resulting in approximately $600,000 in sale proceeds, which were used to reduce GNCU's secured debt and to pay operational costs in the ordinary course of business.

32. In addition, the Debtors employed Blackmon Auctions, Inc. ("Blackmon") to conduct an online auction of the remaining equipment, including racks and certain greenhouse structures, tractors, and trailers, among other things, and remaining inventory, which proceeds will be or have been paid to secured lenders and operating costs.

**D.    Events Leading to Bankruptcy**

33. Since August 2022, the Debtors worked collaboratively with the Lenders to wind down operations and effectuate sales of the assets. It has been my understanding from conversations that the Lenders have and continue to prefer and support an out-of-court liquidation of assets. However, Debtors have informed the Lenders several times of the eventual need to seek bankruptcy protection.

34. With growing operations winding down, the Debtors terminated the majority of employees between August and December 2022. As of today, only a handful of employees, including myself, remain to maintain remaining assets and operations.

35. Beginning the summer of 2022, Debtors started to receive inquiries from contract counterparties and trade vendors regarding payments. The Debtors attempted to be communicative and responsive to creditor inquiries, having been in the business and developed relationships with vendors for more than 20 years. Eventually, however, creditors began to file and/or threaten legal proceedings, including receiverships and temporary restraining orders to halt the sale of assets, among other things. While Debtors have resolved several lawsuits, other litigation remains pending, including a receivership action filed in state court against Seville Farms, scheduled for hearing on May 13, 2024, and a foreclosure action initiated by GNCU on the Mansfield property, scheduled for foreclosure on May 7, 2024.

36. In light of the outstanding receivership litigation and scheduled foreclosure, Debtors sought chapter 11 bankruptcy relief. After exploring several options, Debtors have determined that chapter 11 provides the best avenue to allow for the Debtors to achieve maximum asset value to pay creditors. The Debtors' chapter 11 filings are to provide a process for the sale of Debtors' remaining assets and payment to creditors with the goal of maximizing value efficiently for the benefit of all parties in interest.

## II.    FIRST DAY RELIEF

37. Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief to facilitate a swift and smooth bankruptcy process. In connection with preparation for these bankruptcy proceedings, I reviewed each of the First Day Motions and I believe that the allegations contained in each are true and correct to the best of my knowledge, information, and belief. The requested relief is critical to ensure the Debtors' ability to continue in operation for purposes of conducting a sale of

assets, and is necessary to avoid immediate and irreparable harm. A description of the First Day Motions, the relief sought therein, and the facts in support are detailed below.

### A. Motion for Joint Administration

38. I believe that the Debtors qualify for joint administration for procedural purposes because they are affiliates. Each Debtor is an affiliate of the other Debtors. The financial affairs and business operations of the Debtors are closely related. Entry of an order directing joint administration of these Chapter 11 Cases will obviate the need for duplicative notices, applications and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their respective estates. Joint administration will, thus, promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

39. Based on these reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, that the Court grant the relief requested in the Joint Administration Motion.

### B. Notice of Complex Case Designation

40. I believe that these Chapter 11 Cases qualify as complex chapter 11 cases because the Debtors have total liabilities in excess of $25 million and there are more than 100 parties-in-interest in these Chapter 11 Cases. I believe that application of the Complex Chapter 11 Procedures to these cases will ensure appropriate notice of the filings in these cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders. Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Case Designation.

C.  **Motion to Limit Notice**

41. The Debtors have also requested that the Court enter an order for limiting notice in order to streamline the distribution of notices and reduce the costs to the Debtors. Debtors seek to limit the parties upon whom notice must be served and designate the manner of service with respect to all matters for which the Bankruptcy Code and the Bankruptcy Rules authorize the Court to designate or limit the parties entitled to notice and the manner of service.

42. The Debtors propose to provide notice of any filing in these cases only to the following parties: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors and their counsel; (iii) the Debtors' secured creditors; (iv) the twenty (20) largest unsecured creditors for each Debtor; (v) governmental entities having a regulatory or statutory interest in these cases; (vi) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rule 2002; (vii) any party whose interests are directly affected; (viii) counsel for and the members of any official committees appointed by this Court; and (ix) any indenture trustee. The foregoing list shall not apply to, and shall not limit notice of: (i) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code; (ii) the date fixed for filing proofs of claim; (iii) the disclosure statement and plan; (iv) the hearing to consider approval of the disclosure statement and confirmation of a plan; (v) the dates fixed for filing objections to the disclosure statement and plan; (vi) the dates fixed to submit ballots for accepting or rejecting the plan; (vii) any motions to sell substantially all of the Debtors' assets and related notices of hearing and/or deadlines; and (viii) any hearing on the dismissal or conversion of these Chapter 11 cases, if necessary.

43. I believe that limiting notice is necessary and appropriate because there are more than 200 creditors and parties in interest. Providing notice of all matters to numerous creditors

and other parties in interest would: (i) delay the provision of notice in each particular instance; (ii) place a significant administrative burden on the Debtors' estates, and (iii) impede the consummation of transactions, negotiation of settlements, or the granting of other relief that may be advantageous to the Debtors' estates and their creditors. Furthermore, providing notice of all matters to all creditors or potential creditors would unnecessarily increase the administrative costs of these Chapter 11 Cases.

44. The requested relief will reduce the burden, complication, delay and cost to the Debtors' estates associated with providing notice of all matters to scores of creditors and other parties in interest. The Debtors' proposed Notice Procedures[3] will mitigate the administrative burden that would otherwise be imposed upon the estates without diminishing creditor participation in the administration of these Chapter 11 cases.

45. In addition, the Notice Procedures will not impair the right of a party whose interest is directly affected by a particular matter to receive all filings related to that matter. The Notice Procedures will promote the Debtors' reorganization efforts by preserving assets that otherwise would be consumed by unnecessary copying costs, postage and related expenses. For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Motion to Limit Notice.

### D. Schedules Extension Motion

46. The Schedules Extension Motion requests an extension of the time periods in which the Debtors must file their schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements"). The Schedules Extension Motion requests a two-week extension

---

[3] All capitalized terms that are not defined herein shall have the meaning ascribed to them in the respective Motion.

until May 29, 2024. Given the complexity of their financial affairs and the large number of potential creditors and parties-in-interest, it will take substantial time, to analyze and compile the information needed to complete Debtors' Schedules and Statements.

47. At this juncture, a two-week extension through May 29, 2024, should provide sufficient time for Debtors to prepare and file their Schedules. Accordingly, the Debtors have requested that the Court establish May 29, 2024, as the date on or before which they must file their Schedules and Statements, without prejudice to the Debtors' right to seek further extensions from this Court, or to seek a waiver of the requirement of filing certain Schedules and Statements.

48. Based upon the foregoing, I believe that it is in the best interests of the Debtors, their estates and creditors, and all parties in interest that the Court grant the relief requested in the Schedules Extension Motion.

### E.  Utilities Motion

49. The Debtors request the entry of interim and final orders (i) prohibiting utility companies from altering, refusing, or discontinuing utility services, (ii) deeming utility companies adequately assured of future performance, (iii) permitting payment of all pre-petition amounts owed and (iv) establishing procedures for determining adequate assurance of payment. In the ordinary course of business, the Debtors incur expenses for electric and internet services provided by one utility provider. Uninterrupted utility services are essential to the success of the liquidation. It is important that utility services continue uninterrupted during these chapter 11 cases as these services maintain the accounting and other servers necessary for the Debtors' historical data and also ensure continuation of operations related to a tenant located on the Los Fresnos property.

50. I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate

assurance are necessary in these cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these cases. Moreover, a Utility Provider could unilaterally decide – on or after the thirtieth (30th) day following the Petition Date – that it is not adequately assured of future performance and discontinue service or make a demand for payment to continue service. Discontinuation of utility service could shut down remaining operations required to maintain assets. The Debtors propose to leave prepetition deposits in place and to continue paying the bills of utilities in the ordinary course of business. While this will mean that certain prepetition bills for utilities will be paid, the alternative is that utilities will apply deposits to prepetition amounts leaving the Debtors in the position of having to make new deposits. The effect, money wise, will be the same, but the alternative to the proposal of the debtors would be disruptive.

51. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will enable the Debtors to continue to liquidation efforts, maintain the Debtors' server and electronic books and records, allow for the continued operations of the tenant at the Los Fresnos property (who pays the water expense related to the Debtors' account) and will provide the utility providers with assurance that their payments will not be interrupted and that no precipitous action need to be taken. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**F.    Request for Expedited Consideration**

52. Due to the nature of the relief sought in the First Day Motions, expedited consideration is necessary to provide the requested relief and notice.

### III.    CONCLUSION

53. For the reasons stated herein and in each of the First Day Motions filed concurrently with the commencement of the Debtors' Cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the Declaration, is to the best of my information and belief, true and correct.

Fort Worth, Texas, this 7th day of May, 2024.

*/s/ William A. Brentlinger*
William A. Brentlinger, President of Seville Farms, Inc. and Brentwood Nursery, Inc.; Manager of Hillister Farms, L.L.C.; Managing Member of GB2 Holdings, LLC; and on behalf of Woodbridge Partners, L.P. and Integrated Botanics, LP, as President of Seville Farms, Inc., the General Partner.